Good morning, my name is Megan O'Reilly with the Western Environmental Law Center on behalf of the appellants of the Moapa Band of Paiutes from the Sierra Club. And if possible, I'd like to reserve five minutes for rebuttal. Keep your interglottic count down, and we'll try to help you. Thank you. So we have a very brief background. This case involves the Reed Gardner Generating Station, a coal-fired power plant in Nevada, which is located about a third of a mile from the Moapa Reservation and a few miles from the town of Moapa. Now, is the town of Moapa on the reservation? No, it's a little confusing. The reservation is to the west of the facility, and the town of Moapa is to the north. I wanted to make sure, because there's some statement in the record, that the reservation is downwind from the proposed ponds, but the town is upwind. So to the extent that there's going to be any blowing of residue or whatever it's going to be, it's going toward the reservation. Yes and no. From the windrows data that DLM provided in the environmental assessment, the reservation can be downwind and the town can be downwind. The winds are predominantly one way, but there are certainly periods of time where they're going. And there is a community on the reservation as well. Sorry for the interruption. And this case involves the expansion of the power plant onto DLM lands, allowing for the addition of nine new evaporation ponds and a landfill, which would be used for the disposal of 10.2 million cubic yards of hazardous waste. I'd like to start by addressing two issues here this morning. First, I'd like to discuss what I think is a dispositive issue in this case, and whether or not DLM properly considered its regulations before allowing hazardous waste to be disposed of on public lands. And second, I'd like to address DLM's analysis of cumulative impacts in the environmental assessment, which by DLM's own admission was cursory, and whether or not that renders the environmental assessment invalid. So to start with the hazardous waste argument, the question of whether DLM properly allowed for the disposal of hazardous waste is dispositive for two reasons. First, DLM's entire record allowing the expansion is premised on an erroneous legal foundation that the coal ash waste produced by the power plant was not in fact hazardous, or is not in fact hazardous. Second, even if this court could somehow find that that is harmless air, DLM's regulations still require it to make a specific finding with regard to hazardous waste before it can allow disposal and storage of hazardous waste on DLM lands. So to start with the first point, this court has held in Oregon v. Ashcroft that you must set aside agency decisions which rest on an erroneous legal foundation. Here, DLM did not consider this waste to be hazardous. It did not consider its own regulations regarding hazardous waste to make the determination, which it made in the environmental assessment, that the waste was not hazardous. It looked at its own, not only did it not look at its regulations, but it looked at the wrong manual regarding hazardous waste, which actually prohibited hazardous waste on public lands, and then came to the finding that we don't have to look at that manual because the waste is not in fact hazardous. Again, that was based on an erroneous legal foundation that was not in DLM's own regulations. DLM's regulations, to the contrary, are intentionally broad, and those are DLM's rules in the preamble to their, or excuse me, DLM's words in the preamble to their rule regarding hazardous waste, and it includes some of the substances that are found in the coal ash waste to be disposed of on public lands. DLM now has not argued, since we brought this up in the district court litigation, that this waste is not hazardous. They've essentially competed that the waste was hazardous by their regulation. However, instead of remanding for a new environmental assessment, they're now arguing that, despite the fact that according to the regulations, the waste is hazardous, it's from their, because they made a specific determination in the right-of-way, basically in the boilerplate provisions of the right-of-way, that they could allow for this hazardous waste. So again, DLM's regulations actually require that if hazardous waste is going to be stored on public lands, assuming that they allow for that, that it must, there must be a specific authorization before the grant can allow for that storage. Now, you confuse me a little bit. I thought this hazardous waste argument was basically a flipment argument, but then I heard you say that it has something to do with whether or not the EA is properly done. I'm sorry. I think that there's certainly the argument that DLM has failed to properly consider the impacts of this waste and the environmental assessment. So I'm sorry if I confused those two issues. But I think you're starting out with your first argument is really a flipment argument? Yes. Okay. According to DLM's regulations and active pursuance of flipment, the hazardous waste is not allowed. And again, the regulations require that there's a specific authorization before hazardous waste can be stored on public lands. DLM is saying now that these boilerplate provisions provide that specific authorization. But again, they did not ever determine that this waste was hazardous in the whole process leading up to the right-of-way issuance. As a result, there's no connection, essentially, between the determination, excuse me, between the finding that this waste is not hazardous and then trying to now say that, oh, we've provided for it in these boilerplate provisions. There's no way they could have done that given the fact that they did not determine the waste to be hazardous. So given that, even if the opposing counsel comes up and says, well, it doesn't matter, we're just going to apply these boilerplate provisions and they will be sufficient for the disposal of this amount of hazardous waste on public land, the problem here is that they don't specifically address the coal ash waste. Again, these boilerplate provisions were put in there for presumably other substances that might be used on the right-of-way, including oil or solvents or those sorts of things. I don't want to push you forward, but could you address the NEPA EIS EA argument? Certainly. So my plan this morning, and please ask any other questions as well, but it's to address in particular the cumulative impact analysis and the cumulative impact analysis of air quality and the health impact on the Moapa, because I feel that it's illustrative of sort of the bigger picture here of BLM's failure to address cumulative impact. So BLM, again, provided only a cursory look at cumulative impact of the power plant in its NEPA analysis. NEPA regulations require specifically that BLM address the incremental impact of the action when added to the past, present, and reasonably foreseeable actions, regardless of whether or not those are federal actions or state actions or actions by a private entity. Right. Okay. I got that. But what in particular, and I understand we're supposed to consider these things cumulatively, but what things should have been analyzed better such that when you accumulate all of them, in your view, what were required in the EIS? So looking, again, at the air quality and health impact, here the BLM failed to provide any analysis of the power plant, really, other than to say that it's meeting its air quality regulation or it's meeting the air quality standards provided by other agencies. Don't want to interrupt you. They did not provide any of their own analysis, which is required by NEPA, that BLM do an independent analysis of the impact. Here, instead, it was just cursory explanations of, oh, there won't be any incremental impact, because the ponds are farther away, because we think that or we expect that there will be less impact. So, again, there was no analysis whatsoever in the EA, and, in fact, no studies provided. This Court has found that the agency must back up its findings with credible studies. Here, there's nothing to support that. If you look at the environmental assessment, all of BLM's statements on this point are not supported. There's nothing there. If you look at the references to the environmental assessment, there's nothing in there having to do with air quality and health impact. So what they did is they- I'm not so much interested for the moment in what the operation of the power plant does in the sense of smoke from the burning of the coal and so on, but could you talk about the environmental impact specifically with respect to this project? Like, what's the construction of these nine ponds going to do? How long is it possible that we might have the old ponds and the new ponds operating? What's the effect on hydrogen sulfide? What's the effect on birds? I mean, there's a lot of stuff in your brief that I'd like you to talk about. Okay, I'm sorry I didn't get to your question. Yes, there are numerous things that BLM failed to really consider here. So to provide a little context, there's existing evaporation ponds and the existing landfill, and then the proposed action suggests that the new landfill will be constructed and the ponds will eventually replace those. Again, it's not clear from the environmental assessment how long of an overlap there will be, and this is one of the issues we've raised is that how can we say that there will be no incremental impact if this is sort of a replacement of these facilities if there's no discussion of the- Do we have anything in the record with respect to the hydrogen sulfide in terms of how well the current monitoring system- I mean, I saw in the record what the Nevada Power Company does with respect to aeration and sort of injecting hydrogen peroxide, and so I see that they say that this is what they already do. They've got a protocol in place, and apparently they're saying they're going to continue the protocol. Is there anything in the EA that tells us actually how well that is working, as distinct from what they say they're doing, what the standards are that they're seeking to comply with? No, and again, that's this sort of general trend of the cursory and the conclusory statements in the environmental assessment. So we don't know how well it's working now. They've not given us anything. No, and Nevada Power may have some discussion of that, but the BLM in its environmental assessment did not have any analysis of whether or not the mitigation measures that are proposed to be used, such as the aeration and that sort of thing, would actually- they say that they're likely to decrease impact. However, again, this Court has held that just because you decrease impact doesn't mean that there's not a significant impact. Well, I was looking for data to figure out, okay, what are the current emissions out of the current ponds, and I couldn't find it. If it is, I guess the other side can point me to places in the EA where it is. Yes, and from my understanding, just to try and directly answer your question, I don't- there's nothing in there doing that comparative analysis of here's how well this is working in the current ponds, and here's how much better it's going to work in the new ponds when we implement these measures. What do we know about birds? Do we have anything very quantitative about how many birds now are trapped in the existing ponds? I mean, I read this stuff about it was not quite a flyaway, but we got seasonal presence of birds sometimes. We do know- I mean, they say there's some mortality. Do we know the numbers of mortality? Do we know whether the birds are able to get out of the existing ponds because of- I mean, I understand that there's now a promise that the lining material will be sort of textured so that the birds can get a grip on it to walk out. Is that already in the existing ponds? Do we know how well that works? Again, this is- to try and answer your question in sort of the bigger context, this is illustrative of sort of the problem of this environmental assessment, is there isn't that comparative analysis of whether or not that's actually going to work, whether or not these mitigation measures or design features have been characterized and are going to reduce impact below significance. Instead, there's assertions that they will likely reduce impacts, and that may be the case, and there is some data in the environmental assessment about deaths from birds in the old ponds so far without those measures, but again, there's not- I saw that there's some bird mortality, but I didn't see any numbers. There's- I can try and find the site for rebuttal, but there's something in there about- or the Floating Council might have it quickly- about the actual numbers of previous ponds. Do we know whether the previous ponds, either now or sometime in the past, had this sort of textured liners that would let them get out better? My understanding is that the previous ponds did not have the textured liners. So whatever happened to the previous pond may not tell us very much about what might happen if we have the textured liners. Yes and no. I think there's also the issue, you know, they talk about the textured liners, but there's also the issue of birds becoming laden with solids from the pond, and so whether or not there's a textured liner, if they can't get to the side of the pond to utilize that, it may not matter. I looked for that to see if there was some sense that just getting all this stuff on them would itself create some bird mortality. I mean, I couldn't tell. And me either, and this is, again, sort of the problem with this environmental assessment is just its failure to dig in a little more rather than saying, well, we're going to do some mitigation measures and that will likely decrease impacts. There's not the next level which is required in this sort of meta-analysis to determine whether or not, well, will the improvement still be under a significant threshold? Do we know how well the current ponds are lined? I saw on the record that there was a requirement. I gather when the ponds were first constructed they were not lined, but I gather there was then imposed upon them a requirement that they line those ponds. Do we know if, in fact, they are now lined, and do we know how that lining compares with the proposed lining for the new ponds? Again, no. There's not that comparison of whether or not that's improving things as much as the elements are. And I think it's important to take a step back, if I might, that the ponds that are now required to be lined because of exclusive contamination and Nevada is required under the Administrative Order of Consent to Nevada Power to line those ponds, it still doesn't sort of get to the question, even if we had the data to determine now, well, how are those doing, that doesn't get to the question of whether or not BLM analyzed either actual data, which perhaps was out there, or studies that determined whether or not those sorts of liners, how much they would actually improve things. And so, to be clear, I just want to point out that's not in the record leading up to the environmental assessment. So, whatever the data seems to hold, there's still the threshold question at the onset of whether or not BLM did that sort of analysis before reaching its decision, i.e., whether there's... I saw that the existing plant ponds are very close to the water table, and that the proposed ponds are substantially higher. Is there anything in the record that tells us about the nature of the soil or the rock below where the new ponds would go to tell us whether, in the event of a leak, there would be easy or quick or hardly at all any transportation to the water table? That is to say, if there's a great big crack, it doesn't matter whether you're a foot above or a hundred feet above. On the other hand, if the ground is really hard-packed and impermeable, it matters a lot. Do we know what that ground is like? I don't know that there's that sort of analysis of the ground. I do know that there are requirements that they have to be, I think it's a hundred feet above the water table, and that's why they decided to put these ponds up on... Well, that's not my question. My question is, do we know what the hundred feet is... What's the geological formation in that hundred feet? And my understanding from the record, and hopefully I'm not incorrect here, is that there's no analysis of that sort of thing. BLM instead just says this is going to be a no-discharge facility, and that's kind of where the analysis of water quality impacts. Well, they call themselves a no-discharge facility now, correct? Well, that's how BLM characterizes the current facility, yes. It has huge issues. All right. I think I'll reserve my remaining time and let... Okay, thank you. Good morning. May it please the Court, I'm Catherine Hazard here on behalf of BLM. And I gather you're splitting the argument or not? Splitting the argument, yes. The NBC would like eight minutes. Okay. Okay, thank you. The right-of-way here would allow expansion of the landfill and construction of evaporation ponds and the use of water. With modernized design features, equipment, and monitoring at an improved location, as the Court noted, out of the floodplain. I'm not sure I noted an improved location. I noted it was a different location higher above the water table. That's true. Correction taken. Out of the floodplain of the Muddy River and more than 100 feet above the aquifer. BLM's finding of no significant impact is reported by the record, which contains a convincing statement of reasons and is not arbitrary or capricious. This is not an environmental impact statement. And many of the specifics requested might be appropriate in that context. But when you're dealing with a facility that has minimal impact, there doesn't have to be the kind of exhaustive analysis. Do we know, counsel, from the record, how long these pools would operate concurrently, the new construction as well as the former pools? It doesn't indicate that. It says it's a short period of time. But, in fact, to – It doesn't say short. It says eventually. Well, I think it says there will be limited overlap in the period when there will be concurrent operation. But, in fact, some of the evaporation ponds have already been closed and only two new ones have been constructed and are operating. Well, I didn't realize. So you actually – BLM has actually constructed the new ones despite this lawsuit going forward? Yes. That was agreed to in the district court. And phase one of the landfill has already been completed. That's to believe that it could go forward with those two? Yes. Okay. So at what stage of construction are you right now? There are two evaporation ponds have been constructed and completed. Construction is completed on them. And phase one of the landfill has been completed. So part of the landfill expansion is already in use. Let me ask you this. I'm looking at purpose and need of the proposed action, which is at the beginning of the EA. I think it's on ER-52, but page two of the EA. And in the second paragraph in the section 1.2, it says purpose and need of the proposed action. The need – and I'm now in the second paragraph. The need for the proposed action is to secure adequate evaporation pond and landfill areas because the existing facilities on the Fion property are nearing capacity. Additional land is needed to construct new evaporation pond and landfill facilities. No other land at the facility site is available. And then at the end of the paragraph, construction and operation of the evaporation pond and landfill areas are needed for the continuing operation of all power plant activities with no interruptions or outages. That suggests to me that unless the new ponds are constructed as proposed, there are going to be some constraints on the operation of the power plant. Yes, it is a poorly phrased statement, Your Honor. Well, I'm afraid that's what it says to me. You want to tell me that it doesn't mean what it says? Yeah, I'm afraid that is what I'm in the awkward position of needing to do. And the consideration of the no action alternative is the best demonstration that this is a poorly worded sentence rather than, you know, indicative. The problem with this is – I mean, the BLM wrote this. And I understand you might want to walk away from it a little bit, but they wrote this. But this suggests to me that if these new proposed ponds are built, we might have greater power generation and we might have more continuous operation of the plant and so on. And if they're not built because we're, quote, nearing capacity and because they're needed for the continuous and safe operation, that, in fact, whether or not they are built may affect the degree to which the power plant operates, produces pollution, and so on. Yeah, that is contrary to the whole no action alternative that is included in the EA. But that's what it said right here at the very beginning. And I'm having trouble with the notion then that the only thing we look at is only the ponds and we don't look back at all on any possible environmental impact from the manner in which the power plant is operating. I understand that it's pretty clear on the record, and we do have statements, that the power plant will continue to operate. I got that. But this sounds as though if the new ponds aren't allowed, it may operate differently. Well, I think this one sentence should not be taken in isolation out of context of the whole rest of the EA or indeed out of context of the supplemental information that the plaintiffs rely on here, which shows clearly additional statements by MPC that it will continue to operate and indeed that the alternative, the no action alternative considered in the EA, which was to truck solid waste off-site is economical and is the viable alternative to allowing development on BLM land. Right, but there are two questions there. One is the ponds, and the other one is the disposal of the solid waste. So even if it would be economical if you get the solid waste out of the old ponds to truck them elsewhere than to BLM, that doesn't answer the question as to whether or not we should have the new evaporation ponds. And I understand, and it's very clear in your brief, that there are statements that I think are perfectly believable that the plant will continue to operate. But what I don't see is a clear statement that the plant in the absence of the new ponds will continue to operate in the same way and at the same capacity. Okay, well, there may not be as clear statements as one would desire, but that has been the agency's understanding from the beginning that there's never been any indication by MNPC that it would diminish, that it would early retire or reduce capacity. What our understanding was, and what's analyzed in the no-action alternative, is that it would be more costly to ship the solid waste by truck to truck it off-site. That it would result in a lot more fugitive dust and particulate emissions because of the trucking and also, you know, post and public safety hazards because of the amount of trucking that would be involved. And in addition to the evaporation ponds, that what the no-action alternative would involve was reusing or revamping evaporation ponds that are at the facility, the clay ones that were closed, you know, resurrecting or refurbishing those. But those still would be in the floodplain of the Muddy River, so it wouldn't serve the purpose of getting them out of the floodplain of the Muddy River and above the aquifer. Right. Let me ask you some of the questions that I asked, I think it was Mr. O'Reilly, about what we do and don't know from what's in the EA, in the administrative record we can look at. Do we know the actual discharge of hydrogen sulfide from the existing ponds? They are monitored. I know that, but I'm asking do we know the actual discharges? I don't see that in the EA. I looked for it and I couldn't find it. No, I don't see it either. I can see the protocol that they currently follow or say they follow, and they say they will continue to follow, and I see the standards, but I don't see anything that tells us how well it's actually operating. Well, NPC may be able to provide that information, because I know they are focused in preparing, but I also want to say, though, that there are data in the EA on the emissions, monitoring data on emissions from the plant, which would include emissions from the evaporation ponds, but not ones that are specific to the evaporation ponds. Because I'm interested for the moment in the hydrogen sulfide that comes out of the ponds that starts to show up when the bacteria get busy, and you can apparently control the bacteria by injecting hydrogen peroxide or keeping it aerated and so on. And I kind of read my way through the protocols. I'm trying to figure out, okay, how well is that working? And I'm having trouble seeing any guarantees as to, okay, we know how this is going to work and so on. Okay, and the Nevada people can tell me if there is something on the record that tells us how that's actually been performing. As to the emissions from the facility, from the monitoring, that's at ER 91. This is from the facility? This is from the power plant? Right. And at ER 72, it says the ponds are designed to emit less hydrogen sulfide, but I understand your question in that regard. Well, actually, I looked at this. This is monitoring data summary. Okay, this is from the plant itself. Right. Do we have a date on this? I looked at this table and I couldn't figure it out. I looked at this table and I had trouble understanding it. Yeah, I'm not sure what the date on it is. I would have to look that up and provide it later if the court would like it. It's kind of as if I'm looking at a miniature EIS and I'm trying to figure out, okay, what information is this transmitting? And I couldn't figure out what it was actually telling me. I read the numbers, but it didn't tell me this is on such and such a date. It didn't tell me, okay, this has been the average over a one-year period. It just gave me all these numbers. All right, well, I can't answer that right now. Perhaps NPC's counsel will be able to. But I do want to just note, and perhaps you discerned this already, but it took me a while to figure it out in studying this table myself, that there are different sites. In the left-hand column, the measures are for different sites around the facility. So the figures that I used in my brief were, for example, for hydrogen sulfide, were the highest for any of the sites. It's at year 91. Yeah, I closed it up again. Okay, I'm there, okay. Okay, so if you look in the left-hand side, there's Site 2, Site 3, Site 4, Site 5. And the hydrogen sulfide appears in some of them. The particulate matter appears in some of them. And the measures are different at different places. The figures that I used would show a huge gap between the measured concentrations and the standards. I used, because there are different measures at different sites, for example, for Site 4, the hydrogen sulfide one-hour maximum is 16.7. But for Site 5, the hydrogen sulfide one-hour maximum is 2.5. So in my brief, I just used a higher number. Yeah, yeah. It seems to me your brief was treating those numbers honestly. I just can't tell you whether, you know, this is on a really good day, it's an average. I don't know. Yeah, perhaps the EA reveals that I can't answer you right at this moment. I wanted to, unless you have more specific questions. Can I ask you a question? I'm particularly concerned with the BLM's analysis with regard to the impact on cultural resources, given that this is an archeologically sensitive area. Was the BLM's focus a little too narrow? Because I don't see anything in the regulations that require the BLM to just limit the impact of sites that are eligible for registration. Right. I don't think its analysis was too narrow. It hired a contractor to go out and do a whole cultural resource analysis, and that was included in the draft EA that is referenced to report in the description of what they found. And what they found was there are 12, you know, sites of scattered, you know, rock fragments, which might have been used for tool stones or flakes from food storage caches and livestock trails. But there was no, I mean, you can tap that pretty much anywhere. There will be some cultural resources. But I would say it found none of significance, and the only cultural area that was of concern to the tribe and identified by the tribe was then excluded from the right-of-way by BLM. If you need the site references for that, I can give them to you. But in addition, the right-of-way itself provides protections, further protections, in case in the excavation significant cultural resources are discovered. It requires that the operator then cease construction and contact BLM. BLM will contact the tribe, and they'll do a consultation. There will be a halting on any construction, which makes sense. I mean, you know, not necessarily everything will appear on the surface. So that would be true, really, with any project that would involve excavation, whether it's highway or building construction or whatever. I wanted to quickly address the FLPMA issue, unless the court has further questions on NEPA. And I'm watching the time run on you. You'll get your time, so you can relax. And Ms. Hazard, you can say what you need to say. Okay, thank you very much. As to FLPMA, in the supplemental excerpt of record at 424 is the manual in effect in 2006. And what it excludes is hazardous or what it prohibits from permanent disposal is permanent disposal of RCRA subtitle C, hazardous waste. That's in the supplemental excerpt of record at 424. That is the manual that was in effect in 2006 when the EA was done. The manual in effect in 1995, which plaintiff's counsel referenced, did not specifically identify RCRA subtitle C. So VLM, in determining that the waste were not hazardous waste prohibited from permanent storage or disposal, was first understanding that it couldn't dispose of any hazardous materials there. And then, under the regulations, the only thing, or under the manual, the only kind of material prohibited is the RCRA subtitle C hazardous waste, which nobody has argued these are. Moreover, FLPMA's own regulations don't prohibit disposal of hazardous waste or hazardous material on VLM lands, and VLM acted in accord with those regulations. The right-of-way itself also provides that NVC must comply with all applicable local, state, and federal environmental laws and existing or hereinafter enacted. So if the status of coal ash waste changes and additional restrictions apply to its disposal, those will be applied when the ponds are retired. Does the court have any further questions? Okay, thank you. Thank you. How much time are you going to stay for your Nevada? Eight. Okay. Would you put eight minutes on the clock? Thank you. May it please the court. My name is Dan Dunn. I'm here on behalf of Nevada Power Company. I'm going to depart from my prepared script and answer a number of the questions. Speak loudly because I'm deaf. I'm going to depart from my script and answer a number of the questions that you've raised, because I think those are the most important for your consideration. First, very simply, quickly, this fly ash that's disposed as a solid waste on the right-of-way is not a hazardous waste. It's just not. It's a hazardous material, and the FLTMA regulation at issue certainly allows the disposal of that material if the right-of-way terms permit it. So that's not an issue in the case. A quick other point, the wind direction from my client's facility to the Moapa Reservation, the prevailing winds are, in fact, away from the reservation. And that can be found in the environmental assessment at pages 86 and 217 to 222. Forgive me, that's the excerpted record pages, 86 and 217 to 222, just for the record. Probably the most important issue that's been raised in the briefs and that you've raised in your comments is the issue of impacts to the air quality and the public health from hydrogen sulfide and dust particulates measured by PM10. Judge Fletcher, I have very specific sites for you on that table. When you have a moment, I can get to those. Well, I'm just looking at the wind roses and so on. I see the wind roses, and I see the description of the direction, and I guess I'm supposed to overlay those onto a map so I can see where the propons are and where the reservation is and so on. Well, I appreciate the difficulty, and I also hope you appreciate the fact that EAs, by definition, have to be concise and brief, and that's just not. All we can do is give the deference to BLM that they did what they were supposed to, and the wind rose data and the statement is what there is. And I think that's sufficient, but in any event. I just want to register that it's not easy for me to look at the pages. I mean, I saw them, and so I look at them again, to see where the ponds and the power plant are in relation to these winds and the reservation and the town. And I understand, and I just reiterate there's a limit to it. It's 216 pages, densely packed with a lot of information, and, yeah, there are some limitations to it. Enough said. It's not an EIS. And you didn't draft it. At least I don't think you did. But let me get to the real important issue about impacts to air quality and, therefore, public health. This is really important. If you are to look at tables 3-1 and 3-2 under the air quality, those are the ones you were looking at earlier. That's page 91. Yeah, and I only have references to the ER, the record. I've got tables 3-1 and 3-2 here in front of me. Okay, first question. When was this data measured? If you go back to page 31 of the EA, at the very bottom, it tells you exactly how long of a period it was measured. I'm on page 31 of the EA. Where does it tell me? Bottom, bottom paragraph. You'll see some dates that mention July 1, 2006. No, I'm on the wrong page now. Is it 31 of the ER? It's 31 of the EIS. I'm on page 31 of the EA, and I don't see it. Well, we've got two numbers, the ER numbers and the page numbers. I'm sorry. I'm on 15. I'm looking at the wrong 31. No, that's my fault, not yours. Okay. Page 31 of the EA, if you look at the very last sentence on that page, it tells you exactly what period of time the air quality data was gathered. From July 1, 2006 for a full year. Okay, so you got that. But the most important thing to look at on that table, Your Honor, and this goes to the heart of why it was reasonable to conclude there was no significant impact to human health or the air quality. The air monitoring requirements, first of all, under the table, you have to look at figure 10 as well as tables 3-2 and 3-1. But here's the net analysis. The air quality standards for particulate and for hydrogen sulfide are established and reflected on table 3-2 in one of the far right-hand columns. They show what is safe, and these are levels set by EPA in the state of Nevada that are not just protective of human health, but they're built in with margins of safety to protect the most vulnerable, the most sensitive of our people. So those standards are clearly able to be used by BLM to measure whether there's any significant impact. Now, if you look at the other data, if you look at the monitoring stations on table 3-2, for two points of measurement, one is called RMS, that's the Reservation Monitoring Station, which is right smack in the middle of the residential area of the Moapa. Those levels show that hydrogen sulfide was measured at 2.2 parts per billion when the air quality standard is 112, a tiny fraction. So what that tells you is a couple things. One, there's no significant impact from existing operations, the ponds, Your Honor, that there is just none of significance from the existing operations. The same is true for particulate matter. Now, if you look at the map, figure 10, where these monitoring stations are monitored or placed, one, in addition to being right in the middle of the reservation, and the other one right on the edge of the existing evaporation pond is called PMS-4 or PAQ-4. So just know that these existing data do measure the impact of hydrogen sulfide on the ambient air environment and the public health. Then take into account the fact that there is no net increase in the amount of surface area that's being used as a result of this right-of-way. The plant is not generating any more evaporation water for evaporation. It just needs a certain surface area. That has not increased one percent. So the plant only evaporates water from a certain defined amount of surface area. That has not increased. Then you take into account the measures for preventing the hydrogen sulfide, aeration, agitation, the addition of hydrogen peroxide, a hydrogen sulfide monitoring plan, and an emergency response plan. There is no chance that these new ponds with those enhanced design elements would contribute anywhere near that would come close to the air standards for hydrogen sulfide and PM10. That's how BLM reached this decision in terms of showing no significant impact to the air or to the public health. One of the arguments that's raised is that the new ponds are going to be built at a higher elevation, and so, therefore, the hydrogen sulfide would then settle on the land below. Did the EA address that issue at all? I understand that you think it's a weak argument, but I didn't see that discussed within the EA's report. That very specific point, I think, was addressed, at least indirectly, by their conclusion that these ponds are a mile farther away. A mile farther away from what? A mile farther away from the Moapa Reservation than the existing ponds. That's a huge distance, Your Honor. Just imagine the amount of space that that has to dilute. So particulates, as well, a lot of elements are heavier than air, but there's no suggestion in the record, first of all, that there would be any significant emissions of hydrogen sulfide from the new ponds because of the design, the way they were designed, and the way they're required to be operated. So the premise that some cloud of hydrogen sulfide is going to drip down and in a boat haul type of incident expose these people is just not accurate. The BLM's analysis is because it is built farther away. If anything, that would actually be an improvement over the status quo. Absolutely, and I keep coming back to it. Hydrogen sulfide is not going to form because they got the oxygen. They got the oxygen. They got the aeration. They got the hydrogen peroxide injection. Now, I'm going to quickly turn to the ponds because you had some questions about the ponds, and I want to talk about those. First and foremost, the most important thing to remember is what I said before, no increase in the surface area is needed because of the existing, the right-of-way does not increase the surface area. But these are no-leakage facilities. Double liners with 60 mil, 80 mil HPDE liners are state-of-the-art. They're used to manage the most hazardous waste that EPA regulates, liquid hazardous waste. There is no reasonable chance, nor has there been anything in the record to suggest, that those ponds will not perform as designed. They have fail-safe systems. They have an additional liner, 60 or 80 mil thick, made out of material that is designed not to leak. Below that, interstitial monitoring and collection systems, so if there's any seepage, that is immediately collected and pumped back before it can have any opportunity to go through the second liner. And then the second liner is also protected. Couple that with the fact that these new ponds are moved farther away and are 150 feet above the groundwater table. Now you ask, is there anything in the record that describes the geology of the earth between the lowest layer of the liner and the water table? Well, the answer is yes. And you can find it at page 46 of the EA, where they discuss the geology and they specifically mention the strata that exists between the bottom of the pond and the water table as consisting of a bunch of different terms that I don't fully understand, but there's one very important one, that there are layers of clay, clay-y sands that exist in the geology. So they did address it in that place. And I think this court can defer to BLM's judgment that 150 feet, when you already have state-of-the-art ponds with liners, leak detection, interstitial collection and pumping, I guess you could think there could be a catastrophic failure that could eventually get in, but the rule of reason, I don't think, would allow us to conclude that. Okay, that's very helpful. Help me on one other point, and that is, we've got a whole bunch of possible environmental effects, all of which we have to think about, or at least the BLM has to think about and put into the EA. Something that the Nevada Department of Wildlife asked about was, what do we do to reduce bird mortality? And the Department of Wildlife made two points. Number one, how about some texturizing on the liners so they can get out? And how about some netting so maybe they don't get in in the first place? And the BLM answered, well, we'll do the texturing, and didn't say a thing about the netting. Now, the Department of Wildlife says, well, under the current pond designs, you can't do the netting because the span is too big. Obviously, I don't know how much this will cost with media, so this is a hypothetical redesign. Obviously, you can have a lot of narrow ponds so the netting would be feasible, but I just didn't see the answer in the record as to that concern. Well, it's a good question, and let me try to answer it as best I can. First, you're right. The Department of Wildlife determined it was not practical to put nets over this large of an area. So that was... As new ponds are currently designed. But, you know, the Department of Wildlife has issued to my client artificial pond permits, and those permits require a number of things. First, that there's careful monitoring of any mortality to birds, and we can't sit here before you and say no birds have been killed because they have. Do we know how many have been? Well, Your Honor, it's not in the record, so I can give you an answer, but it would not be in the record. My problem is I need to know, given the word value and the EA, I need to know what's in the record. Yeah, but I'll tell you what is in the record, and that is that the level of mortality in the existing ponds is relatively low. That's the characterization. It's qualitative, not quantitative, and I know sometimes that's important, but in this case, I'm not sure. The other thing to keep in mind on birds is, you know, these construction of the new ponds cannot occur during the migratory nesting. There are a number of measures that the permit within DOW, Department of Wildlife, requires besides monitoring. There is a reflection that there will be ongoing dialogue between Department of Wildlife and my clients. That has, in fact, occurred. I can't cite to you the record because it happened after the EA was prepared, but it's contemplated that there would be ongoing discussions to consider and implement additional protective measures. The other thing to keep in mind on birds, there's no endangered species here at all. We're talking- No, but that's not the point. The point is what's the impact on the environment, and, of course, if you've got endangered species, that triggers a whole different set of things, but we're not talking Endangered Species Act, we're talking NEPA. Yeah, and I guess I would say, one, there's no indication that the existing ponds are having any significant impact on birds, and, two, I do think it's incumbent upon somebody challenging an EA in their comments to the BLM before the final is issued or to the district court or to you that they have some burden of proof. It's not as if that BLM has got to consider everything. There has to be a realistic potential for significant impacts, and the Sierra Club in this case has not even carried that minimal burden as far as I can tell. There's no suggestion that an untoward number of birds have been killed. There's not even- I don't know the answer to that. I do know that we've got a letter from the Department of Wildlife that expresses real concern. You're right, and it does express a concern, and the concerns have been addressed in the NDOW permit process, their oversight, the monitoring that goes on, the hazing that goes on. That's all I can tell you at this point on the birds, Your Honor. They're just not, I think, a record fairly read. Help me with the point. I know we're over time, but I want to- because there's some things about this case that are troubling me, and I want to make sure that I put them in front of you so you get a chance to respond. The passage that I read at the very beginning of the EA as a purpose of need, and you heard me read it to Ms. Hazard, the way that's written, it says that we're running out of capacity and that the new ponds are necessary for the continued and effective operation of the plant. Are you telling me that's not true? Your Honor, I will tell you that it's, depending on how you read it, I understand perfectly when I saw it, I'm prepared to answer that question very specifically. Here's the answer. The sentence in the purpose of need does say, evaporation ponds and more landfill space are needed for the continued operation. The point, and this is critical, all that really means is that my client needed more space. It doesn't mean that it needed the space from this right-of-way. In fact, what would have happened on the landfill, the waste, once the existing landfill reached capacity, they would have been trucked off-site. Secondly, as to the ponds, this is also very important, the ponds on the existing facility would simply have been continued to be used. They are all double-lined with interstitial monitoring, and we could have chosen to continue to use those existing ponds, but the environmental risk associated with that, because they're in the floodplain in a hundred-year flood event, moving them up on the mesa, it was one of the most important environmental attributes of this whole action. So, you know, the ponds, they serve a beneficial purpose. They were moved. There's no increase in the evaporative surface, no increase in the generation of liquid waste, no chance for incremental or cumulative effects of the ponds. And do we know, the word in the EA is eventually, but as I read the EA, it seems to me to contemplate the possible operation of the old ponds and the new ponds simultaneously for an indeterminate period, indeterminate, captured by the word eventually, and I don't quite know what eventually means. Yeah, and again, an excellent question, and let me try to answer it as best I can. Number one, we begin with that premise. There's no more surface area that's needed to handle the waste. In fact, the plant is not going to increase any generation of waste. So you start with that... That's totally inconsistent, and what you're telling me to be absolutely true, is that it's totally inconsistent with the sentence that says the need for the proposed action is to secure adequate pond and landfill areas, or both, pond and landfill, because the existing facilities are nearing capacity. But you're telling me, no, you don't need any more, it's just you want to put them somewhere else. Exactly, we would have... You're telling me something that's quite different from what's on this page. I'm not telling you that. Nothing is perfect, obviously. And you didn't write that, I don't think. I do want you to understand, and this really is important, that my client, and the record does reflect this, would have continued to use the existing evaporation ponds and the other areas on its plant where the old ponds were located, the ones that weren't on, they would have simply built these facilities in that area so the right-of-way, the right-of-way, is not something that was necessary in the sense of indispensable to the continued operation of the plant. We would have used the existing ponds or other acreage or found it on fee land nearby, and we would have trucked the waste when the landfill reached capacity to another landfill. More cost, more adverse environmental impacts associated with that. We don't get the ponds out of the floodplain, they're still there. That's okay if they're double-lined, which all of them have to be. And, you know, it's just not true that this right-of-way allowed the continued operations of the facility, nor is it true that, I mean, and it's in the no-action alternative. It basically says, what happens if we don't give you this permit? Well, what did it say? It said the plant will continue to operate for 30 years. But you heard me with Miss Hazard. Continuing to operate doesn't necessarily mean at the same capacity or in the same manner. Again, what you're telling me may be absolutely right. I'm just stuck with language here that doesn't match exactly with what you're telling me. And I'm going to end with this point. Thank you for extending my time. But, again, this I think is real important. We fully understand this court's duty and BLM's duty to take a hard look at this material. No question about that. We believe they have. But there is also a rule of reasoning that applies when you're dealing with an EA, which is by definition to be a concise and brief description of the environmental impacts, unlike an EIS. It's not just a mini-EIS. That, you've got to keep that into consideration, and I know you will. But when you step back from all of this, all these detailed facts, there's one overriding fact that has to be kept in mind. That is, this right-of-way allowed for improved environmental conditions and effects by moving it farther away and using it with state-of-the-art technology. And I think it would be contrary to the rule of reason, and frankly, sadly ironic, if this court were to allow a challenge under NEPA, whose very goal is to improve the environment, to undo an action that unquestionably has benefits for the environment. Well, if we were to hold that an EIS is required, that wouldn't undo the action. It wouldn't require a more thorough study. And NEPA's a really interesting statute because so long as everything is spelled out carefully, I mean, you can do all kinds of stuff. You just have to study it. So this wouldn't necessarily stop it. It might hold it up and so on. Here's a question that I think is going to be my last question. I'll ask the other side as well. If this is such an environmental improvement by taking these out of the flood plains so that when a hundred-year flood comes, it's not going to sort of wash all this crap into the river and may otherwise be an environmental improvement because it may be extremely harmful to the birds if we're more certain now that it's not going to get down into the aquifer and so on. Why isn't the Sierra Club cherry you wanted? I don't know. That's a question I can't answer. I'll ask them too, but I thought you might have some insight. Well, I will tell you that they have a campaign against coal-fired power plants. And this is one of five different actions they've instituted. And it's all designed to deter utilities from burning coal. That's my cut on that. Thank you. Thank you. Let me start with that question. Is this actually an environmental improvement because we're taking it out of the flood plain? We're not increasing the surface area of the evaporation ponds. We are transporting the solid waste that we'll eventually find at the bottom of the ponds a shorter distance. We've got double linings, so we are not going to get leaks. And if we do get leaks, we've got 150 feet of clay between the bottom of the pond and the aquifer. So what's not to like about that? And why are you opposed? I think the first answer is that this is remembering, as Council pointed out, this is a NEPA case. This is to address all of the impacts of this action. And that is the whole purpose of NEPA. The twin aims of NEPA are to provide informed agency action and an informed public to make sure that the public also knows the environmental impact before a decision is made. That is just critical in this case, as many of your questions have pointed out. The record just doesn't provide this information. But to answer your question, I think, you know, the Moapa and the Sierra Club are concerned about the environmental assessment that was done for this because we think there is a potential for cumulative impacts. And that's the standard. That's the burden on us. I understand. In fact, you started your argument under cumulative impacts. So accumulating what? I mean, so what are we adding up and saying the cumulative impact is so strong we need a more thorough study? What are we accumulating? It's the reg state, the past, present, and future actions. And here the agency specifically stated it wasn't going to consider the cumulative impact of the plan and the proposed action. So there's really nothing in the record. And I think this goes to, again, a lot of the questions that have been asked today, that maybe the hydrogen sulfide meets the air quality standards that are set. But this Court has repeatedly held that certification by another agency does not satisfy the NEPA duty, that it's the NEPA agency's duty to take a look at the whole thing, not just the air quality impact. And the D.C. Circuit, I think, explained it well, that the requirement of that agency is to look at a specific parameter, air quality, for instance, or water quality, or migratory birds, and to look at it just for that particular purpose. BLM's duty in doing NEPA analysis is to look at all of those things and determine what is the impact of these on human health, for example. And the reason I use that as an example is because it is just, if you look at the record, there are statements where BLM is saying, what are we going to address? Are we going to address the cumulative impact of the proposed action and the plan? And they say, well, we can't separate out the impact, so we'll just focus on the proposed action. I want to ask you the same question again. I understand the concept of cumulative impact, and I understand it may be that they've not said the magic words about cumulative impact. But I'm more interested in the specifics. Okay, cumulative impact means you've got maybe four possible consequences, and you look at all of them, and you look at the cumulative consequence of all of them. So what are the one, two, three, four, five, or whatever it is that you're wanting us to accumulate, and what's wrong with each one of the ones that they've not properly studied? Well, starting with the health impacts, I mean, there's been huge health impacts from the proposed, or excuse me, from the existing plans and the facility. So take those impacts and then add any potential impacts from... And when we say huge health impacts, what is there in the record that tells us this, or what evidence do we have that there's something not in the record that should have been put into the record about, quote, huge health impacts? There are multiple comments from the people about respiratory illnesses, et cetera, about these instances of asthma. There's a doctor's report that says we see a lot of respiratory-related illnesses on the reservation. There's something about a health district letter, which they've stated or cited for this proposition, that it says don't worry about anything, but in fact what it says is we just can't separate it out, although there may be true health impacts, and here are some resources that you can use to actually study those impacts in greater detail. It sounds as though those health impacts, I mean, as I'm looking at what's in here, are largely from the operation of the power plant and the discharges from the burning rather than from either the ponds or from the disposal of solid waste. Is that correct? I think there are potentially impacts from the plant, but there's also certainly impacts from the existing ponds and the hydrogen sulfide that's emanating from those, and then there may be impacts from the proposed action in those ponds as well. That's what we're stating really hasn't been fleshed out in this environmental assessment. With regard to the health impacts, let's assume for a moment, just for the sake of argument, that there are health, negative health impacts from the existence of the current ponds. We do have a line of cases, most recently just last year with Tri-Valley Cares and before that Burbank Anti-Noise Group, that indicates that if the status quo isn't changed or if the status quo is actually improved, then the agency finding of no significant environmental impact may be reasonable. So how do you reconcile that with regard to the facts of this case if we accept BLM's environmental study that there's no significant impact beyond whatever impact there is from the existing facility, for example? I think those cases are distinguishable in the fact that Burbank Anti-Noise Group, for example, and the court stated that there was no impact to the status quo because it was just federal financial assistance for the transfer of an airport. The court specifically noted that no further development was provided for in the agreement and that before any such development could occur, there would be additional analysis. Whereas here, again, this is a very different situation. It's not just that the one pond that we're going to take the ponds away, that they're going to poof, disappear and we're going to put in their place these new ponds, albeit in a different location. Instead, what's happening is that you have existing ponds that still have all of these issues that are under an administrative order of consent. You still have pollution emanating from those. You have the power plant that will still. What about Tri-Valley Cares where we were considering a challenge to the adequacy of an environmental study and that does involve the construction of a new facility? And then I think the issue was that they, so the court that you mandated on a very specific issue of whether or not the agency was addressing, adequately addressing the potential impact of a terrorist threat and the release of a pathogen. And the court found that because there's 1,300 other sites throughout the U.S. or I think the U.S. that have that pathogen and that that threat exists for this incremental impact here was that they did not need to, that it didn't materially alter the status quo. Again, here it's a different situation. It's not just a little bit of an impact. It's the construction. There's bulldozers on the ground building these nine-year evaporation ponds and expanding the landfill that will, you know, the impacts will overlap, as the court has noted in questions today, and we're not sure for how long. The plant will continue operating. You have these impacts on top of each other, and I think here they went through an analysis and said going through that analysis is important and said that the incremental impact won't be significant, and this is exactly what BLM hasn't done here. Along the lines of that construction, I just want to clarify a point in regards to the construction that has occurred, and BLM characterized it as that we sort of agreed to that construction, and I just want to make clear for the court that we sent letters starting in May of 2010 saying we have supplemental information and we'd like to be kept abreast of what's going on because my clients learned that potentially construction was actually going to be starting on the facility. We sent another letter. We sent follow-up emails saying please keep us abreast of what's going on. We filed our complaint. I made a point to look for counsel to make sure that we knew what was going on, that we were getting updates, and it wasn't until January of next year that BLM said, oh, there's ponds that are already being constructed, and they're almost done, and so it was at that point that we entered into a stipulation saying, well, given the fact that these ponds are almost complete and ready for operation, that we will have a stay on preliminary release for those two ponds, but I just want to clarify that we weren't aware of construction. We had been told that there was a preliminary disturbance going on for monitoring and that sort of thing, but not that there was actual construction. So the stipulation only covered the two ponds, newly constructed ponds, and there's no construction that's ongoing at this point? There is construction ongoing on the landfill, and that was for which we filed our motion for preliminary release last year, and this court denied that, but there is construction going on on the landfill presently. Okay. Thank you. Thank you very much.
judges: Duffy, Fletcher, Nguyen